**Opinion issued June 9, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00143-CR

———————————

## WAYNE EDWARD LINDSEY, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1426650**

---

## MEMORANDUM OPINION

A jury convicted appellant, Wayne Edward Lindsey, of the second-degree

felony offense of aggravated assault and assessed his punishment at twenty years'

confinement.[1]  In three issues, appellant contends that: (1) the trial court erred by refusing to admit evidence of the complainant's fourteen prior convictions; (2) the trial court erroneously denied his request for a jury instruction on the right to use deadly force to prevent the complainant from fleeing after allegedly trying to rob him; and (3) the trial court erroneously denied his motions for mistrial made during the State's punishment-phase argument when the prosecutor, on four occasions, commented on his failure to testify.

We affirm.

### Background

Torreon Wells, his mother, Lakeisha Scruggs, and Dequalin Backstrom, the complainant, all lived in the same house together.  On April 29, 2014, Wells, Scruggs, and Backstrom drove Backstrom's car over to appellant's house because appellant was a mechanic and Backstrom was experiencing trouble with his car. Appellant and Backstrom knew each other and "were friendly."  Appellant spent about thirty minutes looking at Backstrom's car, told him what the problem was, and then started discussing his fee with Backstrom.  Appellant requested $50 as payment, but Backstrom thought that price was too high because appellant did not actually do anything to fix the problem.  Backstrom eventually told appellant that he only had

---

[1]    *See* TEX. PENAL CODE ANN. § 22.02(a)(1) (Vernon 2011).

2

$35 with him at the time and that he would need to come back later with the rest of the money.

Appellant started yelling at Backstrom, who, after listening to appellant yell for several minutes, hit appellant in the face with his fist. Wells testified that, after Backstrom punched appellant, appellant said, "I got something for you," and went inside his garage. While appellant was inside, Backstrom got into his car and started backing out of appellant's driveway. Appellant returned and pointed a gun at Backstrom through the windshield. Appellant ordered Backstrom out of the car and started walking around to the driver's side door. Backstrom started to get out of the car, but appellant hit him in the jaw and on the top of the head with the gun, and Backstrom sat back down in the driver's seat. Wells testified that as appellant started to hit Backstrom again, the gun went off, shooting Backstrom in the lower jaw.[2]

Wells stated that Backstrom did not say anything and was not being aggressive at the time of the shooting, but was instead trying to get away from appellant. Wells also testified that appellant no longer appeared concerned about the money that Backstrom owed him, and appellant stated, "Don't you [ever] put your hands on me again. I hope you die." When Scruggs requested that appellant retrieve a towel to

---

[2]     The bullet traveled through Backstrom's jaw and neck and lodged in his shoulder. Backstrom was paralyzed as a result of the shooting, and he resides at a nursing home.

3

help stop Backstrom's bleeding after the shooting, appellant refused. Wells found a towel in the garage and held it to Backstrom's neck until an ambulance arrived.

Lakeisha Scruggs testified that she drove to appellant's house after a dentist appointment, and when she arrived, appellant and Backstrom were getting along. The men started arguing when appellant requested $50 for his services and Backstrom informed him that he only had $35 with him. Both appellant and Backstrom cursed at each other, with appellant waving his hands in Backstrom's face, and then Backstrom punched appellant. Appellant then ran into his garage and returned with a gun, which he pointed at Backstrom, who was trying to leave. Scruggs saw appellant open the driver's side door to Backstrom's car and hit Backstrom with the gun three times before the gun went off. Scruggs could not see Backstrom's hands during this encounter, but she testified that she had no doubt that appellant was holding the gun when it discharged. Appellant refused to call 9-1-1, refused to get Backstrom a towel, and stated, "I'm not getting shit. He can bleed to death," before sitting down in his garage.

Milton Atterberry, appellant's next-door neighbor, also witnessed portions of the altercation. Atterberry walked over to appellant's house while he was looking at Backstrom's car, and he heard appellant explain to Backstrom that he needed a specific part. Backstrom declined to purchase the part, but Atterberry stated that both men were still getting along at this point. Atterberry returned to his house for

4

about five to ten minutes, and when he came back outside, appellant and Backstrom were "talking smack" to each other, but Atterberry did not get the impression that they were about to fight. Atterberry went inside his house again for about fifteen minutes, and, this time, when he came back outside, he saw Backstrom hit appellant. He saw Backstrom get in his car and try to leave, and then he saw appellant come out of his garage, holding a gun and pointing it at Backstrom. Atterberry heard appellant order Backstrom out of the car and demand, "Where is my goddamn money?" Atterberry saw appellant hit Backstrom twice on the head with the gun, which caused Backstrom to fall down, and then, when appellant tried to hit Backstrom a third time, Backstrom grabbed a hold of the gun and the gun discharged. He testified that appellant called 9-1-1, but he otherwise did not attempt to help Backstrom after the shooting.

Cozetta Backstrom, Dequalin Backstrom's mother, testified about what Backstrom was like before and after the shooting. When asked "how was your son physically and mentally" before the shooting, she testified:

> Before the accident, my son is very strong. He's very strong, he works, he does what he's supposed to do. He's a father. He's a father. He takes care of my grandbaby. He's 8 years old. And he takes care of my grandbaby. He goes to work. He's responsible.

She testified that since the shooting, Backstrom resides at a long-term nursing home. Backstrom is paralyzed, has a feeding tube, is unresponsive, and is in a "persistent vegetative state."

After Cozetta Backstrom testified on direct examination, appellant's counsel sought to introduce evidence of Backstrom's fourteen prior convictions, dating back to 1999. Defense counsel stated that he intended to ask Cozetta Backstrom on cross-examination if it was true that her son had had "quite a few instances where he's run afoul of the law." The State objected to relevance, and the trial court sustained the objection.

At the charge conference, defense counsel requested an instruction informing the jury that use of deadly force to prevent robbery is justified, and he argued that appellant was entitled to this instruction because Backstrom committed the offense of theft of services when he tried to leave appellant's house without paying appellant for his work. The trial court refused to include this instruction. The charge did include an instruction on self-defense and an instruction on the use of deadly force. Ultimately, the jury convicted appellant of aggravated assault.

At the punishment phase, the State offered evidence that appellant had a prior felony conviction for delivery of a controlled substance and re-offered all of the evidence from the guilt-innocence phase. Appellant did not testify on his own behalf, either during the guilt-innocence phase or during the punishment phase. During the State's closing argument, the prosecutor stated, "In order to edge towards the lower end of punishment, wouldn't you have to exhibit remorse?" Defense counsel objected to this statement as "an obvious comment on [his] client's failure

6

to testify." The trial court sustained the objection and instructed the jury to disregard the prosecutor's statement, but the court refused to grant appellant's motion for mistrial. The prosecutor later stated that appellant "is the type of person who doesn't take responsibility, who thinks what he did was not just okay or justified—" and defense counsel again objected to this statement as a comment on appellant's failure to testify. The trial court again sustained the objection and gave an instruction to disregard, but did not grant appellant's motion for mistrial.

The prosecutor later asked, "What kind of things move [the punishment verdict] towards the bottom range? Is it being contrite and apologetic?" Defense counsel objected to this statement as a comment on appellant's failure to testify, and the trial court sustained the objection and gave an instruction to disregard but did not grant appellant's motion for mistrial. The prosecutor also stated, "[Y]ou and I know this man does not feel bad. He does not feel guilty. He doesn't wish it had happened differently." The trial court again sustained defense counsel's objection and gave an instruction to disregard, but the court did not grant appellant's motion for mistrial.[3]

The jury ultimately assessed appellant's punishment at twenty years' confinement. This appeal followed.

---

[3] With respect to this statement, the trial court instructed the jury to "disregard the last statement if it was taken in the present tense." The prosecutor then stated, "He does not feel bad or guilty as he sits in his garage and waits for the police to arrive. That's who this defendant was. That is the man that you are punishing. Those are his actions. That's what he needs to be held accountable for."

## Exclusion of Evidence

In his first issue, appellant contends that the trial court erred by refusing to admit evidence that Backstrom had fourteen prior felony convictions. Specifically, appellant argues that the trial court erred by refusing to allow him to question Backstrom's mother about her knowledge of Backstrom's prior convictions because this evidence was admissible under Rule of Evidence 609.

We review the trial court's ruling on the exclusion of evidence for an abuse of discretion. *See Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007); *Turner v. State*, 443 S.W.3d 328, 332 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). We will uphold the trial court's evidentiary ruling as long as it falls within the zone of reasonable disagreement and is correct under any theory of law applicable to the case. *Winegarner*, 235 S.W.3d at 790; *Turner*, 443 S.W.3d at 332.

Generally, when attacking the credibility of a witness, the trial court may admit evidence of prior criminal convictions only if the crime was a felony or involved moral turpitude and the court determines that the probative value of the conviction outweighs its prejudicial effect. *See* TEX. R. EVID. 609(a), 61 TEX. B.J. 374, 390 (Tex. & Tex. Crim. App. 1998, amended 2015);[4] *Turner*, 443 S.W.3d at

---

[4] Effective April 1, 2015, the Texas Supreme Court adopted amendments to the Texas Rules of Evidence. *See* 78 TEX. B.J. 42 (Tex. 2015). The revisions to Rule 609(a) were stylistic and do not affect the substance of the rule. All further citations to Rule 609(a) refer to the rule as it existed at the time of appellant's trial.

332. Rule 609, however, explicitly applies to a party's attempts to attack the credibility of a "witness." *See* TEX. R. EVID. 609(a) ("For the purpose of attacking the credibility of a *witness*, evidence that the witness has been convicted of a crime . . . ."). Appellant cites no authority for the proposition that this rule applies to attack the credibility of a complainant who, as here, does not testify as a witness at trial.

Even if Rule 609 permitted appellant to use a complainant's prior convictions for impeachment purposes when the complainant does not testify, to the extent appellant contends that admission of Backstrom's prior convictions was necessary "to blunt the false impression [created by Cozetta Backstrom's testimony] the jury had regarding [Backstrom's] character," this argument is unavailing. An exception to Rule 609 applies when a witness "makes statements concerning his past conduct that suggest he has never been arrested, charged, or convicted of any offense." *Turner*, 443 S.W.3d at 332 (quoting *Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App. 1993)); *see also Winegarner*, 235 S.W.3d at 790 (stating that exception applies when witness "leaves a false impression with respect to his prior behavior or the extent of his prior troubles with the law"). "If the witness creates a false impression of law-abiding behavior, he 'opens the door' on his 'otherwise irrelevant past criminal history and opposing counsel may expose the falsehood.'" *Turner*, 443 S.W.3d at 332 (quoting *Delk*, 855 S.W.2d at 704). This exception is a "narrow one,

9

and any statements that are alleged to have left a false impression must be viewed in context." *Grant v. State*, 247 S.W.3d 360, 367 (Tex. App.—Austin 2008, pet. ref'd). For this exception to apply, the witness must "unambiguously create a false impression of law-abiding behavior, thereby permitting introduction of evidence of past criminal history." *Hernandez v. State*, 351 S.W.3d 156, 160 (Tex. App.—Texarkana 2011, pet. ref'd); *Grant*, 247 S.W.3d at 367 ("In order, however, to open the door to the use of prior crimes for the purposes of impeachment, the witness must do more than just imply that he abides by the law, and must in some way convey the impression that he has never committed a crime.") (quoting *Lopez v. State*, 990 S.W.2d 770, 777 (Tex. App.—Austin 1999, no pet.)).

Here, the State asked Cozetta Backstrom, "[P]rior to April 29th, 2014, [the day of the shooting,] how was your son physically and mentally?" Cozetta responded:

> Before the accident, my son is very strong. He's very strong, he works, he does what he's supposed to do. He's a father. He's a father. He takes care of my grandbaby. He's 8 years old. And he takes care of my grandbaby. He goes to work. He's responsible.

The State did not ask Cozetta whether her son was a law-abiding man or whether he had ever been in trouble with the law. Instead, the State asked about Backstrom's physical and mental capabilities before the shooting in order to draw a contrast with his capabilities after the shooting as a result of his injuries. Cozetta responded that, before the shooting, Backstrom was strong, he could work, and he could take care

10

of his son.  Cozetta later testified that, as a result of the shooting, Backstrom was paralyzed and in a "persistent vegetative state" in a local nursing home.  Cozetta's testimony did not "unambiguously create a false impression of law-abiding behavior" or "convey the impression that [Backstrom] has never committed a crime."  *See Hernandez*, 351 S.W.3d at 160; *Grant*, 247 S.W.3d at 367.  Her testimony thus did not create a false impression such that appellant could introduce Backstrom's prior convictions in order to correct that impression.  *See Grant*, 247 S.W.3d at 367 (noting that this exception to Rule 609 is "narrow").

We hold that the trial court did not abuse its discretion by excluding evidence of Backstrom's prior felony convictions.

We overrule appellant's first issue.

### Jury Instruction on Right to Use Deadly Force

In his second issue, appellant contends that the trial court erred by denying his request for a jury instruction on the right to use deadly force to prevent Backstrom from fleeing after trying to rob him.

We use a two-step process in reviewing jury charge error.  *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005).  First, we determine whether error exists in the charge.  *Id.*  If error does exist, we review the record to determine whether the error caused sufficient harm to require reversal of the conviction.  *Id.*  When the defendant properly objected to the error in the charge, reversal is required unless the

11

error was harmless. *Id.*; *see also Starks v. State*, 127 S.W.3d 127, 133 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd, untimely filed) (providing that, to preserve error in jury charge, defendant must object or request specific charge).

When a defensive theory is raised by the evidence from any source, the theory must be submitted to the jury. *See Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997). If the defense is supported by the evidence, the defendant is entitled to an instruction on that defense, regardless of whether the supporting evidence is strong, feeble, unimpeached, or contradicted, and even when the trial court is of the opinion that the supporting evidence is not credible. *See Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007); *see also Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007) (holding same). "A defendant need not testify in order for a defensive issue to be sufficiently raised." *Johnson v. State*, 271 S.W.3d 359, 362 (Tex. App.—Beaumont 2008, pet. ref'd). Defensive issues may be raised by the testimony of any witness, including ones called by the State. *Id.* We review a trial court's decision not to include an instruction on a defensive issue in the charge for an abuse of discretion, and we view the evidence in the light most favorable to the defendant's requested submission. *See Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006); *Love v. State*, 199 S.W.3d 447, 455 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

Penal Code section 9.41 provides:

(a)     A person in lawful possession of land or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property.

(b)     A person unlawfully dispossessed of land or tangible, movable property by another is justified in using force against the other when and to the degree the actor reasonably believes the force is immediately necessary to reenter the land or recover the property if the actor uses the force immediately or in fresh pursuit after the dispossession and:

(1)     the actor reasonably believes the other had no claim of right when he dispossessed the actor; or

(2)     the other accomplished the dispossession by using force, threat, or fraud against the actor.

TEX. PENAL CODE ANN. § 9.41 (Vernon 2011). Penal Code section 9.42 provides a defense for the use of deadly force to protect property:

A person is justified in using deadly force against another to protect land or tangible, movable property:

(1)     if he would be justified in using force against the other under Section 9.41; and

(2)     when and to the degree he reasonably believes the deadly force is immediately necessary:

(A)     to prevent the other's imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime; or

(B)     to prevent the other who is fleeing immediately after committing burglary, robbery, aggravated robbery, or theft during the nighttime from escaping with the property; and

(3)     he reasonably believes that:

13

> (A)    the land or property cannot be protected or recovered by any other means; or
>
> (B)    the use of force other than deadly force to protect or recover the land or property would expose the actor or another to a substantial risk of death or serious bodily injury.

*Id.* § 9.42 (Vernon 2011). The Penal Code defines "deadly force" as "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3) (Vernon 2011).

Here, appellant argues that he was entitled to an instruction on the defense of use of deadly force to protect property because "Backstrom arguably committed the offense of robbery by striking [a]ppellant in the face with his fist and attempting to flee the scene without paying for [a]ppellant's services." The plain language of both sections 9.41 and 9.42 provides a justification for using force or deadly force to protect "land or tangible, movable property." *See id.* §§ 9.41–.42; *cf. Sparks v. State*, 177 S.W.3d 127, 132 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding that trial court erred in refusing defendant's requested defense-of-property instruction when record contained evidence that complainant pointed shotgun at defendant and demanded money from him). Even if Backstrom committed robbery by trying to flee appellant's property without paying appellant for his efforts in determining the trouble with Backstrom's car, this case involves, as appellant acknowledges in his appellate brief, theft of appellant's *services*, which are intangible. The record

14

contains no evidence that Backstrom attempted to steal "tangible, movable property" from appellant.

We conclude that, under the facts of this case, neither section 9.41 nor 9.42 applies to provide a justification for appellant's actions. We therefore hold that the trial court properly refused to submit a jury instruction on use of deadly force to protect property.

We overrule appellant's second issue.

**Comments on Failure to Testify**

In his third issue, appellant contends that the trial court erred by failing to grant his motions for mistrial made when the State, on four occasions during the prosecutor's punishment-phase argument, commented on appellant's failure to testify.

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). "A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009) (quoting *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004)). A prompt instruction to disregard from the trial court is usually enough to cure the error and avoid the need for a mistrial. *Wesbrook v. State*, 29 S.W.3d 103, 115–16 (Tex. Crim. App. 2000). Whether an error requires a mistrial must be determined

by the particular facts of the case. *Ladd*, 3 S.W.3d at 567. To determine whether the trial court abused its discretion by denying a mistrial due to a prosecutor's statements during argument, we balance three factors: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Carballo v. State*, 303 S.W.3d 742, 748 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing *Archie v. State*, 221 S.W.3d 695, 700 (Tex. Crim. App. 2007)).

A comment on the defendant's failure to testify violates the defendant's state and federal constitutional rights against self-incrimination, as well as the provisions of Code of Criminal Procedure article 38.08. *Id.* at 747–48; *see* U.S. CONST. amend. V; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 38.08 (Vernon 2005) ("[T]he failure of any defendant to so testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause."). The Court of Criminal Appeals has held:

> To violate the right against self-incrimination, the offending language must be viewed from the jury's standpoint and the implication that the comment referred to the defendant's failure to testify must be clear. It is not sufficient that the language might be construed as an implied or indirect allusion. The test is whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify. In applying this standard, the context in which the comment was made

16

must be analyzed to determine whether the language used was of such a character.

*Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007) (quoting *Bustamante v. State*, 48 S.W.3d 761, 765 (Tex. Crim. App. 2001)); *Carballo*, 303 S.W.3d at 748. We evaluate objectionable arguments on a case-by-case basis "for what it would 'necessarily and naturally' mean to a jury when taken in the full context of its utterance." *Cruz*, 225 S.W.3d at 549.

A prosecutor's argument concerning whether a defendant is presently remorseful as he sits in the courtroom at trial is "a circumstance that only [the defendant] could have testified to," it "highlight[s] for the jury the [defendant's] failure to take the stand and claim present remorse," and "a jury is not entitled to infer as much from its impression of his courtroom demeanor." *Snowden v. State*, 353 S.W.3d 815, 823–24 (Tex. Crim. App. 2011); *Dickinson v. State*, 685 S.W.2d 320, 324–25 (Tex. Crim. App. 1984) (holding that prosecutor's comments relating to defendant's in-court lack of "remorsefulness," "lack of showing sorrow for the victim," and "failure to exhibit shamefulness . . . amounted to directing the jury's attention to the failure of the appellant to testify to these various mental states," and because only defendant could have given testimony concerning those mental states, statements constituted impermissible comment on defendant's failure to testify). If, however, the prosecutor's statements infer that the defendant experienced no remorse at the time of the offense and this inference is supported by the record, the

argument is permissible. *Snowden*, 353 S.W.3d at 824; *see also Randolph v. State*, 353 S.W.3d 887, 893 (Tex. Crim. App. 2011) ("[I]f evidence in the record supports the prosecutor's remarks, there is no error.").

Here, appellant argues that the prosecutor, during the State's punishment-phase argument, commented on his failure to testify on four occasions. Specifically, appellant contends that the prosecutor improperly commented on his failure to testify when she rhetorically asked, "In order to edge towards the lower end of punishment, wouldn't you have to exhibit remorse?" The prosecutor later stated that appellant "is the type of person who doesn't take responsibility, who thinks what he did was not just okay or justified . . . ." The prosecutor also rhetorically asked, when suggesting facts the jury should consider in deciding punishment, "What kind of things move [the punishment verdict] towards the bottom range? Is it being contrite and apologetic?" Finally, the prosecutor stated, "[B]ut you and I know [appellant] does not feel bad. He does not feel guilty. He doesn't wish it had happened differently." On each occasion, defense counsel objected, requested an instruction to disregard, and moved for a mistrial. On each occasion, the trial court sustained the objection and instructed the jury to disregard the statement, but the court denied appellant's motions for mistrial.

Appellant did not testify in this case, either during the guilt-innocence or the punishment phase. However, Wells, Scruggs, and Atterberry, who all witnessed the

18

shooting, testified concerning appellant's actions and statements after he shot Backstrom. Wells testified that, after the shooting, Scruggs requested that appellant retrieve a towel from his garage so she could attempt to stop Backstrom's bleeding, but appellant refused. Scruggs testified that appellant refused to call 9-1-1, refused to find a towel, and stated, "I'm not getting shit. He can bleed to death," before sitting down in his garage. Atterberry testified that appellant was the one who called 9-1-1, but he testified that, other than making that phone call, appellant did not attempt to help Backstrom. After the trial court instructed the jury to disregard the last of the prosecutor's challenged statements "if it was taken in the present tense," the prosecutor stated, "[Appellant] does not feel bad or guilty as he sits in his garage and waits for the police to arrive. That's who this defendant was. That is the man that you are punishing. Those are his actions. That's what he needs to be held accountable for."

Looking at the prosecutor's statements in the context in which they were made, as we must, we conclude that the language the prosecutor used was not "of such a character that the jury would *necessarily and naturally* take it as a comment on the defendant's failure to testify." *See id.* at 548 (emphasis added). The prosecutor did not specifically comment on appellant's apparent lack of remorse based on his courtroom demeanor. Instead, the prosecutor focused on appellant's actions at the time of the offense. There was evidence in the record that appellant

19

made, at best, a minimal effort to help Backstrom following the shooting by calling 9-1-1, although this testimony was disputed and two witnesses testified that appellant refused to call 9-1-1. Three witnesses agreed that appellant refused to help Scruggs tend to Backstrom while waiting for the ambulance to arrive. The evidence also reflected that appellant demonstrated indifference to Backstrom's injuries, telling Scruggs, "He can bleed to death," while refusing to assist her. Appellant's own actions and statements at the time of the offense, testified to without objection during the guilt-innocence phase, thus demonstrated his lack of remorse and contrition for the shooting. *See Snowden*, 353 S.W.3d at 824 ("But the inference that the appellant experienced no remorse at the time that he punched Jennings in the stomach was circumstantially supported by the record, and it was only *this* lack of remorse that the prosecutor re-emphasized in her later punishment-phase summation."); *see also Cruz*, 225 S.W.3d at 549–50 ("[I]t is clear from the record that the prosecutor's statements to the jury referred to the appellant's own written statement which had been admitted into evidence and were therefore not a comment on the appellant's failure to testify.").

We conclude that the challenged statements by the prosecutor were not impermissible comments on appellant's failure to testify. We therefore hold that the trial court did not err by refusing to grant a mistrial based on these statements.

We overrule appellant's third issue.

**Conclusion**

We affirm the judgment of the trial court.

                                        Evelyn V. Keyes
                                        Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.

Do not publish.  TEX. R. APP. P. 47.2(b).

21